IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

MICHAEL BUSH                                )
                                            )
    Pro Se Plaintiff                     )
                                            )
v.                                          )    CIVIL ACTION NO: 1:21-cv-12039
                                            )
ACTON-BOXBOROUGH REGIONAL      )    *Leave to file granted on September 12, 2022*
SCHOOL DISTRICT,                            )
PETER LIGHT, in his official and            )
individual capacities                       )
DAWN GRIFFIN BENTLEY, in her       )
official and individual capacities          )
ERIN O'BRIEN BETTEZ, in her official  )
and individual capacities                   )
                                            )
    Defendants                          )

---

1ST AMENDED COMPLAINT
*Leave to file granted on September 12, 2022*
(For Declaratory and Injunctive Relief and Damages)

## JURISDICTIONAL AUTHORITY OF THE COURT

1) This action is brought pursuant to 28 U.S.C. §§ 1331 and 1343, and 28 U.S.C. §§ 2201,

2202, 42 U.S.C. §§ 1971-73, 42 U.S.C. §§ 1983, 1985. This Court has jurisdiction

specifically delegated to it by act of the United States Congress in the Americans with

Disabilities Act. This action seeks to redress the deprivation under State and federal law

of rights, privileges, and immunities secured by the United States Constitution and the

laws of the United States.

## PARTIES TO THIS ACTION

2) The Plaintiff, Michael Bush, ("the Plaintiff") resides at 280 Lowell Street in Carlisle, Middlesex County, in the Commonwealth of Massachusetts.

3) Defendant, Acton-Boxborough Regional School District is a governmental subdivision of the Commonwealth of Massachusetts with a place of business at 15 Charter Road in Acton, Middlesex County in the Commonwealth of Massachusetts.

4) Defendant, Peter Light, is the Superintendent of the Acton-Boxborough Regional School District with a place of business at 15 Charter Road in Acton, Middlesex County in the Commonwealth of Massachusetts. This Defendant is sued in his official and individual capacities.

5) Defendant, Erin O'Brien Bettez, is the Director of Community Education of the Acton-Boxborough Regional School District with a place of business at 15 Charter Road in Acton, Middlesex County in the Commonwealth of Massachusetts. This Defendant is sued in her official and individual capacities.

6) Defendant, Dawn Griffin Bentley, was the Assistant Superintendent for Diversity, Equity, & Inclusion of the Acton-Boxborough Regional School District at the time of the events in this complaint with a place of residence at 215 Middle Road in Boxborough, Middlesex County in the Commonwealth of Massachusetts. This Defendant is sued in her official and individual capacities.

<u>FACTUAL BACKGROUND TO THIS CLAIM</u>

7) The Plaintiff regularly played adult volleyball in the evenings via the Acton Boxborough School District's Community Education ("Community Education") program for over ten years before that program was placed on hiatus from early 2020 to September 2021 as part of the governmental response to cases of COVID-19 and the virus associated with it

(SARS-CoV-2).

8) In August and September 2021 Defendant Erin O'Brien Bettez and Community Education's volleyball instructor David Liu sent the Plaintiff email messages announcing the resumption of volleyball classes and the mandatory usage of face masks by all participants.

9) The Plaintiff registered for the adult volleyball classes to begin September 21st, 2021.

10) Prior to the commencement of the classes, the Defendants implemented their Policy revised 8/19/21 mandating face masks/coverings be worn (enclosed as Exhibit 1).

11) Wearing face masks is medically contraindicated for the Plaintiff. (The Plaintiff's physician's letter to that effect is enclosed as Exhibit 2. The Plaintiff's related statements are enclosed as Affidavit 1).

12) Prior to this date, the body of evidence was already present refuting the efficacy of face masks for preventing the spread of SARS-CoV-2/COVID-19. See Exhibit 3 with its stated conclusion that, "The use of cloth facemasks in community settings has become an accepted public policy response to decrease disease transmission during the COVID-19 pandemic. Yet evidence of facemask efficacy is based primarily on observational studies that are subject to confounding and on mechanistic studies that rely on surrogate endpoints (such as droplet dispersion) as proxies for disease transmission. The available clinical evidence of facemask efficacy is of low quality and the best available clinical evidence has mostly failed to show efficacy, with fourteen of sixteen identified randomized controlled trials comparing face masks to no mask controls failing to find statistically significant benefit in the intent-to-treat populations." Though the review was

dated November 2021, all or virtually all of the studies it reviews were published before the Defendants' discriminatory actions against the Plaintiff.

13) Face mask mandates do not significantly reduce the spread of COVID-19.

14) Face mask mandates increase the fatality rate of COVID-19.

15) A published study stated that "The objective of this study was to find out whether mask mandates contribute to the COVID-19 CFR [case fatality rate] by comparing data between Kansas counties that had mask mandates and those that did not have mask mandates during the same time period in the summer of 2020. The most important finding from this study is that contrary to the accepted thought that fewer people are dying because infection rates are reduced by masks, this was not the case. Results from this study strongly suggest that mask mandates actually caused about 1.5 times the number of deaths or ∼50% more deaths compared to no mask mandates. This means that the risk for the individual wearing the mask should even be higher, because there is an unknown number of people in MMC who either do not obey mask mandates, are exempted for medical reasons or do not go to public places where mask mandates are in effect. These people do not have an increased risk and thus the risk on the other people under a mask mandate is actually higher." Fögen, Zacharias MD∗. The Foegen effect: A mechanism by which facemasks contribute to the COVID-19 case fatality rate. Medicine: February 18, 2022 - Volume 101 - Issue 7 - p e28924 doi: 10.1097/MD.0000000000028924

16) In the formulation of its Policy, the District did not provide any countervailing evidence to the identified material, giving the impression that the policy was arbitrary, capricious and not based on any nexus between the mask policy and public health.

17) Prior to the Defendants barring the Plaintiff from their facility due to his not wearing a face mask, it was well-documented that wearing face masks has a range of physical and psychological harms. (See Exhibits 4 and 5 enclosed.)

18) In early 2020 the administration of Massachusetts Governor Charlie Baker commissioned studies on the efficacy of face masks to stop transmission of SARS-CoV-2 / COVID-19.

19) Governor Baker subsequently issued COVID-19 Order No. 31 on May 1, 2020, effective May 6, 2020, mandating usage of face masks to purportedly prevent transmission of the virus.

20) The Defendants' Policy mandating face masks/coverings be worn cited Governor Baker's COVID-19 Order No. 31 as one of its three mask references.

21) COVID-19 Order No. 31 provided absolutely no data, studies, or evidence that usage of face coverings of any kind are of any benefit in regards to COVID-19 or any other infectious disease.

22) In response to a November 2, 2020 public records request, on March 24, 2021 the MA Department of Public Health produced 1,263 pages of emails and attachments.

23) The public records produced reveal that the commissioned studies informed the Baker administration earlier in 2020 that usage of face masks does not prevent the spread of viruses, contrary to the stated purpose of Governor Baker's COVID-19 Order No. 31's in May 2020 mandating face mask usage to purportedly prevent the spread of the SARS-CoV-2 / COVID-19 virus.

24) The public records produced reveal that the commissioned studies informed the Baker administration that wearing anything less than a US NIOSH-approved N95 filtering facepiece respirator that is fit-tested every time it is worn makes for no significant

reduction in the spread and infections of viruses such as SARS-CoV-2 / COVID-19.

25) The public records produced reveal that the commissioned studies informed the Baker administration that only about 10% of the air breathed out by a person wearing a typical fabric or surgical mask is filtered by the mask—the other 90% escapes around the edges; and about only 20% of the air breathed out by a person wearing a non-fit-tested KN95 mask is filtered by the mask.

26) The public records produced reveal that the commissioned studies informed the Baker administration that the above masks and respirators filter particles like SARS-CoV-2 / COVID-19 out of the air moving through (not around) the mask/respirator material at low rates of efficiency.

27) The Defendants' Policy mandating face masks/coverings be worn cited https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html as one of its other mask references.

28) https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html provided absolutely no data, studies, or evidence that usage of face coverings of any kind are of any benefit in regards to COVID-19 or any other infectious disease.

29) The Defendants' Policy mandating face masks/coverings be worn cited www.mass.gov/news/mask-up-ma as its third out of three mask references.

30) www.mass.gov/news/mask-up-ma provided absolutely no data, studies, or evidence that usage of face coverings of any kind are of any benefit in regards to COVID-19 or any other infectious disease.

31) The Defendants' Policy mandating face masks/coverings be worn did not mention any

study, research, effort, or diligence the Defendants had engaged in to determine whether

face masks/coverings were safe and/or effective for preventing the spread of COVID-19

and/or reducing its harmful effects.

32) The Defendants' Policy mandating face masks/coverings be worn failed to disclose any

risks or harms of usage of face masks or coverings.

33) The Defendants' Policy mandating face masks/coverings be worn made no mention of

whether the Defendants would monitor for adverse effects of their mandated usage of

face masks/coverings.

34) The Defendants' Policy mandating face masks/coverings be worn made no mention of

whether the Defendants would monitor whether their mandated usage of face

masks/coverings was of any benefit.

35) Prior to the implementation of the Defendants' mask Policy, the Commonwealth had

already acted within its powers on the issue of masking with its own

order,https://www.mass.gov/info-details/covid-19-mask-requirements which states,

"The following persons are exempt from the face coverings requirement:

- Children under 5 years old.
- Persons for whom a face mask or covering creates a health risk or is not safe because
  of any of the following conditions or circumstances:
    - the face mask or covering affects the person's ability to breathe safely;
    - the person has a mental health or other medical diagnosis that advises against
      wearing a face mask or covering;
    - the person has a disability that prevents them from wearing a face mask or
      covering; or
    - the person depends on supplemental oxygen to breathe.

36) In the formulation of its policy, the Defendants failed to include and/or address the

Commonwealth's requirement of medical exemption.

37) In the formulation of its policy, the District also exceeded its superintendency power, in taking a recommendation narrowly tailored to address concerns, valid or otherwise, of providing a "safe" environment for school-aged children within a school building for the upcoming year, and applying it, over broadly, to adult participants in an after-hours program not subject to the recommendations designed to protect children.

38) The Defendants' Policy mandating face masks/coverings be worn did not provide any specifications for the required masks.

39) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings be approved by the U.S. Food and Drug Administration ("FDA") for stopping the spread of any infectious disease.

40) The FDA is the only U.S. agency authorized to regulate medical products.

41) The U.S. Centers for Disease Control & Prevention ("CDC") does not regulate medical products.

42) The FDA may issue emergency use authorization(s) ("EUA") for medical products.

43) The FDA's approval of a medical product for a particular purpose is distinct from the FDA issuing a medical product an EUA.

44) The FDA may issue EUA for medical products without the medical products being safe or effective for their authorized use(s).

45) Medical products issued EUAs are authorized only for investigational/experimental usage.

46) The FDA has not approved any face mask/covering to stop the spread of COVID-19 or other viral respiratory infections.

47) The FDA has not granted an EUA to any face mask/covering to stop the spread of COVID-19 or other viral respiratory infections in a community setting such as a school or place of public accommodation.

48) The FDA has not approved any face shield to stop the spread of COVID-19 or other viral respiratory infections.

49) The FDA has not granted an EUA to any face shield to stop the spread of COVID-19 or other viral respiratory infections in a community setting such as a school or place of public accommodation.

50) In its August 5th, 2020 letter (enclosed as Exhibit 6), the FDA granted an EUA for certain surgical masks, "limited to the use of the authorized surgical masks, for use in healthcare settings by HCP as PPE to provide a physical barrier to fluids and particulate materials to prevent HCP exposure to respiratory droplets and large particles during surgical mask shortages resulting from the COVID-19 pandemic."

51) In its August 5th, 2020 EUA letter, the FDA also stated that the labeling of the authorized surgical masks must:

- "State that surgical masks are not intended to provide protection against pathogenic biological airborne particulates and are not recommended for use in aerosol generating procedures and any clinical conditions where there is significant risk of infection through inhalation exposure; and

- Not include statements that would misrepresent the product or create an undue risk in light of the public health emergency. For example, the labeling must not include any express or implied claims for: (1) reuse, (2) antimicrobial or antiviral

protection or related uses, (3) infection prevention, infection reduction, or related uses, or (4) viral filtration efficiency."

52) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings be effective for stopping and/or lessening the spread of any infectious disease.

53) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings be approved by the FDA for any public health related purpose.

54) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings have an EUA from the FDA for any purpose.

55) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings be effective for any public health related purpose.

56) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings be safe.

57) The Defendants' Policy mandating face masks/coverings be worn did not specify that the face masks/coverings be free of harmful effects on people.

58) The Defendants' Policy provided specific secular exceptions to the requirement that face masks/coverings be worn.

59) The Defendants' Policy allowed for no religious exceptions to the requirement that face masks/coverings be worn.

60) The Defendants' Policy allowed for no disability-based exceptions to the requirement that face masks/coverings be worn.

61) The Plaintiff mailed Notice and Demand letters to the Defendant, Acton-Boxborough Regional School District and its agents, which were delivered on August 30th, 2021.

(Enclosed as <u>Exhibit 7</u>.)

62) In putting the Defendants on notice of objections to the Policy, the Plaintiff unambiguously put the Defendants on notice of concern that warranted review of the Policy or rescission of the Policy.

63) The Notice and Demand letters notified the Defendants that the face mask policies of Community Education and the school district would preclude the Plaintiff from participation in the classes, as face masks are medically inappropriate for the Plaintiff.

64) The Notice and Demand letters notified the Defendants that some religions, creeds, physical disabilities, and/or mental disabilities prohibit or contraindicate the wearing of masks or face coverings.

65) The Notice and Demand letters notified the Defendants that being required to wear face masks was objectionable to the Plaintiff's sincerely held religious convictions. (Though not required, for the Court's clarity a statement of the Plaintiff's sincerely held religious convictions is enclosed as <u>Affidavit 2</u>.)

66) The Notice and Demand letters notified the Defendants of a Massachusetts statute that prohibits public accommodations (including "a place of public amusement, recreation, sport, exercise or entertainment") from depriving people of any, "religious sect, creed... deafness or blindness, or any physical or mental disability" of the "full enjoyment of the accommodations, advantages, facilities or privileges offered to the general public."

67) The Notice and Demand letters notified the Defendants that masks are not effective for prevention of the spread of COVID-19 and provided citation of medical evidence to that effect.

68) The Notice and Demand letters notified the Defendants that masks have known harms to children and adults and provided citation of medical evidence to that effect.

69) The Notice and Demand letters notified the Defendants that the face mask policies of Community Education and the school district violated the Americans with Disabilities Act, as the policies required persons to wear face masks without regard for their medical needs.

70) The Plaintiff sent the Notice and Demand letters not merely to uphold his own constitutional and civil rights but also to stand up for others' rights and prompt the Defendants to correct their unlawfully discriminatory policies.

71) The Plaintiff did not receive a response to his demand in his Notice and Demand letters for accommodation in the form of release from the mask mandate.

72) Defendants Dawn Griffin Bentley and Erin O'Brien Bettez have never responded to the Plaintiff's Notice and Demand letters addressed and delivered to them.

73) Defendant Dawn Griffin Bentley has taken no action that the Plaintiff is aware of to address his medical and/or religious objections to being required to wear a face mask.

74) Around August 2021 Defendant Dawn Griffin Bentley was reading a book titled *Subtle Acts Of Exclusion*.

75) On August 31, 2021 Defendants Erin O'Brien Bettez and Peter Light exchanged email messages about the Plaintiff's Notice and Demand letters (enclosed as Exhibit 8).

76) In that email exchange Defendant Bettez suggested reiterating to the Plaintiff that masks are required.

77) In that email exchange Defendant Bettez asked Defendant Light if it was possible to call the Acton police about the Plaintiff.

78) Defendant Erin O'Brien Bettez has taken no action that the Plaintiff is aware of to address his medical and/or religious objections to being required to wear a face mask.

79) Defendant Peter Light sent the Plaintiff a letter dated August 31st, 2021 in which Light acknowledged receipt of the Plaintiff's letters (enclosed as <u>Exhibit 9</u>).

80) In Defendant Peter Light's letter, he failed to address the Plaintiff's medical exemption from wearing face masks.

81) Defendant Peter Light has never addressed the Plaintiff's sincerely held religious convictions that keep him from complying with the Defendants' face mask mandate.

82) In Defendant Peter Light's letter he threatened to bar the Plaintiff from all current and future programs in retaliation if the Plaintiff failed to comply with the Policy's face mask requirement.

83) In Defendant Peter Light's letter he attempted to coerce the Plaintiff into wearing a face mask contrary to his medical and religious needs by threatening to deprive the Plaintiff of access to play the volleyball games he was registered for unless the Plaintiff wore a face mask.

84) Regarding the Americans with Disabilities Act ("ADA"), 28 C.F.R. § 36.206 states that, "No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part."

85) Regarding the ADA, 28 C.F.R. § 36.301(a) instructs that, "***General***.  A public accommodation shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from

fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered."

86) On or about September 15, 2021, the Plaintiff, through Counsel, demanded of Defendant Peter Light that medical accommodation for the Plaintiff was required by the Defendant, Acton-Boxborough Regional School District. (Enclosed as Exhibit 10).

87) On September 20th, 2021 Defendant Peter Light attempted to circumvent the Plaintiff's legal counsel by emailing the Plaintiff directly and requesting the Plaintiff's personal medical information. (Enclosed as Exhibit 11).

88) In his September 20th, 2021 email to the Plaintiff, Defendant Peter Light failed to mention how or whether he would protect the Plaintiff's personal medical information.

89) In his September 20th, 2021 email to the Plaintiff, Defendant Peter Light failed to mention why he was still rejecting the Plaintiff's earlier demand for exemption from the face mask requirement.

90) In his September 20th, 2021 email to the Plaintiff, Defendant Peter Light failed to mention why he would not simply let the Plaintiff play volleyball without a face mask as the Plaintiff had demanded.

91) In his September 20th, 2021 email to the Plaintiff, Defendant Peter Light failed to explain why he was circumventing the Plaintiff's attorney.

92) The Plaintiff informed his attorney Robert Meltzer of Defendant Peter Light's email message requesting the Plaintiff's personal medical information.

93) On September 20, 2021 the Plaintiff's attorney Robert Meltzer emailed the Defendants' attorney Justin Gomez and explained that, among other things, "Peter Light reached out

to my client directly and seemed to be trying to circumvent my office. Kindly tell him that at this point until I know the final and official position of the Superintendent on this issue, all communication must run between counsel."

94) Before and since Plaintiff's attorney Robert Meltzer's September 20, 2021 email to the Defendants' attorney Justin Gomez about that, none of the Defendants have asked the Plaintiff or his attorney for input on what exemption and/or accommodation from their Policy would be appropriate for the Plaintiff.

95) Before and since Plaintiff's attorney Robert Meltzer's September 20, 2021 email to the Defendants' attorney Justin Gomez about that, none of the Defendants have initiated an interactive process about what exemption and/or accommodation from their Policy would be appropriate for the Plaintiff.

96) After having received the Plaintiff's Notice and Demand letter on August 30th, 2021 in which she was notified the Community Education face mask policy violated state and federal civil rights laws, Defendant Erin O'Brien Bettez subsequently reviewed and approved a draft of an email message that volleyball instructor David Liu proposed to send to volleyball class registrants which outlined penalties for participants who do not comply with the Policy. Further, Bettez advocated for even harsher penalties against those who do not comply with the unlawful policy.

97) At no time have the Defendants engage in serious or meaningful communication about reasonable accommodation for the Plaintiff.

98) On September 20, 2021, the Plaintiff's counsel received an email message (enclosed as Exhibit 12) from the Defendant's counsel Justin R. Gomez stating that "the District would like to offer that Michael wear a face shield as an alternative face covering".

99) In his September 20, 2021 email message to the Plaintiff's counsel, Justin R. Gomez offered no explanation why the school district was offering that the Plaintiff wear a face shield in lieu of a face mask.

100)     At that time of Defendants' counsel Justin R. Gomez's offer that the Plaintiff wear a face shield, the FDA had not approved any face shield to stop the spread of SARS-CoV-2 / COVID-19.

101)     At that time of Defendants' counsel Justin R. Gomez's offer that the Plaintiff wear a face shield, the FDA had not issued any face shield an EUA to stop the spread of SARS-CoV-2 / COVID-19 in a community setting such as a school or place of public accommodation.

102)     At that time of Defendants' counsel Justin R. Gomez's offer that the Plaintiff wear a face shield, face shields were not approved as safe or effective by the FDA for protecting the wearer or others from infection by SARS-CoV-2 / COVID-19.

103)     The Plaintiff's statements about his knowledge and experience with playing volleyball and wearing a face shield are enclosed as Affidavit 3.

104)     Having already communicated his medical and religious exemptions to the Defendants' face mask requirement, the Plaintiff arrived at the Defendants' RJ Grey Junior High School building shortly before 7:00 p.m. on September 21, 2021 to resume playing volleyball after its 1 ½ year hiatus.

105)     At the building's entrance facing Massachusetts Avenue, the Plaintiff encountered an adult holding a clipboard and sitting in a green chair positioned just outside the entrance. (A photograph of that building entrance taken shortly after that date is enclosed as Exhibit 13.)

106)     The adult sitting outside the building entrance told the Plaintiff she was taking

attendance and asked the Plaintiff's name.

107)     The Plaintiff told the adult his name and the adult replied that she was Erin

Bettez, the Director of Community Education.

108)     Defendant Erin O'Brien Bettez then marked the Plaintiff's attendance on her

clipboard's sheet.

109)     Defendant Erin O'Brien Bettez marked the attendance of two other longtime

volleyball players the Plaintiff knew from that program named Mike and Farshad as they

approached and entered the building.

110)     The Plaintiff then grasped the door to enter the building after his fellow volleyball

players and Defendant Erin O'Brien Bettez told the Plaintiff that he may not enter the

building without wearing a face mask.

111)     The Plaintiff asked Defendant Erin O'Brien Bettez if she was aware that his

attorney and the school's attorney had already communicated about that.

112)     Defendant Erin O'Brien Bettez replied that she was aware of the attorneys having

communicated about that.

113)     Defendant Erin O'Brien Bettez then told the Plaintiff that Superintendent

(Defendant) Peter Light had instructed her that day that she was not to allow the Plaintiff

into the building without him wearing a face mask.

114)     The Plaintiff then asked Defendant Erin O'Brien Bettez if Peter Light had

instructed her to bar *him* specifically.

115)      Defendant Erin O'Brien Bettez then replied, changed her statement, and claimed

that Peter Light had told her to not allow *anyone* into the building without their wearing a

face mask.

116)      Defendant Erin O'Brien Bettez mentioned to the Plaintiff the possibility of

refunding what he had paid to participate in the volleyball program.

117)      Defendant Erin O'Brien Bettez barred the Plaintiff from entering the building and

the Plaintiff told her that he would have his attorney handle that.

118)      As the Plaintiff walked back to the parking lot, he passed his fellow longtime

volleyball players Sergei Burlak and Ray Belz.

119)      Sergei and Ray each separately asked the Plaintiff why he was walking away

from the building.

120)      The Plaintiff explained to Sergei and Ray that face masks are medically

inappropriate for him and the school staff barred him from participation on that basis.

121)      Sergei and Ray each expressed their sympathy and that they were sorry the

Defendants had done that to the Plaintiff.

122)      The Plaintiff felt ostracized, humiliated, and saddened by the Defendants

conspiring to deny him entry to the building and participation in the volleyball program

he loved.

123)      Before that evening of September 21, 2021 when the Defendants conspired to bar

the Plaintiff entry under the guise of "taking attendance", in more than a decade of

regularly playing volleyball in that program, the Plaintiff had never known the

Defendants to station anyone outside the building to take attendance.

124)     The Defendants did not subject others entering the building or participating in Community Education programs to equivalent discrimination or treatment.

125)     The Plaintiff recorded videos on September 28th and 29th, 2021 of that same building entrance around the same time in the evening when such community programs were taking place.

126)     The videos reveal that no one was stationed outside the entrance, there was no longer any chair there, and multiple people entered and exited the building without wearing face coverings of any kind.

127)     In late 2021 and early 2022 while the Defendants were excluding the Plaintiff from playing volleyball in their facility due to his medical contraindications to and religious objections to wearing a face covering, other places of public accommodation in Massachusetts were allowing people to play volleyball indoors without wearing face coverings. (See Exhibit 14 of photos taken during that time period of such volleyball players in other MA facilities, showing most players were not wearing face coverings of any kind.)

128)     Prior to the Acton Boxborough Community Education's adult volleyball games' hiatus from 2020 to 2021, the Plaintiff had regularly played in that volleyball program for more than ten years straight.

129)     During that time of regularly playing volleyball in that program, the Plaintiff developed a rapport with many of the other regular players, enhancing his enjoyment of volleyball.

130)     When that program's volleyball games resumed in September 2021, the Plaintiff strongly desired to rejoin his longtime friends in that volleyball program.

131)     The Defendants' actions to bar the Plaintiff from entering their facility to play

volleyball due to his inability to wear a face covering deprived the Plaintiff of

participating in dozens of sessions of volleyball games over a continuous period of at

least six months.

132)     The Defendants' barring the Plaintiff from entering their facility to play volleyball

due to his inability to wear a face covering caused the Plaintiff distress, tension, sadness,

and despair.

133)     The Defendants have never conducted an individualized assessment to determine

whether the Plaintiff posed a direct threat to the health or safety of others.

134)     The Defendants have never requested to conduct an individualized assessment of

the Plaintiff.

135)     The Defendants have never alleged that the Plaintiff posed a direct threat to the

health or safety of others.

136)     On January 24-25, 2022, Defendants Erin O'Brien Bettez and Peter Light

exchanged email messages discussing the Plaintiff and his medical exemption to their

Policy. (The email messages are enclosed as Exhibit 15.)

137)     In the email exchange Defendant Light replied to Defendant Bettez regarding the

Plaintiff that "I think you can let him know that we still have a mask requirement in place

and that if he has a medical condition that would interfere with his ability to wear a mask

then we are happy to discuss appropriate accommodations such as a face shield."

138)     In the email exchange Defendant Bettez asked Defendant Light "who decides

about his medical condition and the appropriateness of a face mask".

139)     In the email exchange Defendant Light replied to Defendant Bettez that "I am the person with the final decision m [sic] making around accommodations…"

140)     Defendant Light has no medical qualifications.

141)     The Defendants had barred the Plaintiff from their facility for months due to that issue when Defendants Light and Bettez exchanged those emails on January 24-25, 2022.

142)     In that email exchange Defendant Light failed to inform Defendant Bettez that he and/or the Acton-Boxborough School District that employed them both were being sued by the Plaintiff over that issue.

143)     The Plaintiff subsequently received an email message from Defendant Erin O'Brien Bettez on January 25, 2022 on which Defendant Bettez Cc'd Defendant Peter Light and in which Bettez acknowledged that the Plaintiff had registered for all of the volleyball sessions in the next season and reminded the Plaintiff that face masks were still required. (That email message is enclosed as Exhibit 16.)

144)     At the bottom of Defendant Bettez's email message to the Plaintiff was a statement claiming that the Defendant Acton Boxborough Regional School District "does not discriminate on the basis of race, color, sex, sexual orientation, gender identity, religion, disability…"

145)     The Plaintiff received an email message from Defendant Erin O'Brien Bettez on March 4, 2022 in which Defendant Bettez informed the Plaintiff the mask mandate had been lifted and offered to pro-rate his registration fee. (That email thread is enclosed as Exhibit 17.)

146)     At the bottom of Defendant Bettez's email message to the Plaintiff was a statement claiming that the Defendant Acton Boxborough Regional School District "does

not discriminate on the basis of race, color, sex, sexual orientation, gender identity,

religion, disability…"

147)     The Plaintiff has pursued and exhausted administrative remedies in this case. On

September 27th, 2021 via the Department of Justice's online portal the Plaintiff filed a

civil rights complaint, record number 104362-BCX. The Department of Justice has failed

to pursue the matter and has given no explanation.


ADDITIONAL FACTUAL BACKGROUND AS CONTEXT


148)     SARS-CoV-2 / COVID-19 which has dominated American life for much of 2020-

2022 is one of a long series of viruses which have periodically spread across the United

States during the history of the country. Historic evidence indicates that the contagions at

various times have been of higher mortality than at other times, with the Spanish Flu of

1918-1919 serving as one of the more dangerous epidemics in American history.

149)     At the outset of the widespread detection of SARS-CoV-2/COVID-19 in early

2020, it was widely believed by government officials to be a health threat of an unknown

severity to the American population.

150)     By late 2020 the infection fatality rate of COVID-19 was known to be less than

1% in the general population.

151)     By August 2021 there were no deaths of children and teenagers up to the age of

17 in Massachusetts even associated with—much less caused by—COVID-19. (See

enclosed Exhibit 18 of the CDC's data for Massachusetts.)

152)     By the time of the Defendants' challenged conduct in August of 2021 and

onward, the notion that COVID-19 posed an inordinate threat to the general population of the United States had been rebutted.

153)      Eminent epidemiologist and professor of medicine at Stanford University Dr. Jay Bhattacharya and professor of economics at George Mason University Donald. J. Boudreaux explained in an August 2021 article published in the Wall Street Journal that no degree of oppressive measures or violation of civil liberties can eradicate or contain COVID-19. (See Exhibit 19 enclosed.)

154)      Furthermore, they pointed out what has been self-evident to anyone willing to acknowledge the obvious: attempting to eliminate this germ and infectious disease which cannot be contained or eliminated without regard for civil liberties and other aspects of public health is both futile and harmful.

155)      A meta-analysis of contact tracing studies published December 14, 2020 in The Journal of the American Medical Association showed asymptomatic COVID-19 spread was negligible at 0.7%. Zachary J. Madewell, Ph.D.; Yang Yang, Ph.D.; Ira M. Longini Jr, Ph.D.; M. Elizabeth Halloran, MD, DSc; Natalie E. Dean, Ph.D., Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis, JAMA Network Open, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774102 (last visited April 18, 2022).

156)      A study including nearly 10 million participants published on November 20, 2020 found that, "There were no positive tests amongst 1,174 close contacts of asymptomatic cases… Virus cultures were negative for all asymptomatic positive and repositive cases, indicating no 'viable virus' in positive cases detected in this study." Cao, S., Gan, Y.,

Wang, C. et al. Post-lockdown SARS-CoV-2 nucleic acid screening in nearly ten million

residents of Wuhan, China. Nat Commun 11, 5917 (2020).

https://doi.org/10.1038/s41467-020-19802-w (last visited April 18, 2022).

157)     By and before August 2021 the notion that government mandates affecting

individuals' bodily autonomy had any nexus with proper public health response to SARS-

CoV-2 / COVID-19 had been rebutted.

158)     The notion that asymptomatic persons are a significant source of spread of SARS-

CoV-2 / COVID-19 had been debunked long before the Defendants last revised their

challenged Policy in August 2021.

159)      The notion that asymptomatic persons are a significant source of spread of

SARS-CoV-2 / COVID-19 had been debunked long before the Defendants barred the

Plaintiff from their facility from September 2021 and onward.

160)     Studies have shown that naturally-acquired immunity to SARS-CoV-2 / COVID-

19 confers resistance to re-infection superior to and protection from COVID-19 disease

lasting longer than that conferred by "COVID-19 vaccinations". See

https://brownstone.org/articles/how-likely-is-reinfection-following-covid-recovery/ (last

visited April 18, 2022).

161)     The Plaintiff has naturally-acquired, documented immunity to SARS-CoV-

2/COVID-19.

162)     In lieu of barring the Plaintiff from entering their facility because he was not

wearing a face covering, to minimize the spread of COVID-19 in their facility the

Defendants could have merely asked the Plaintiff and/or other registrants in his volleyball

program to simply refrain from entering the building if he/they had reason to believe

he/they were infected and/or had symptoms likely caused by COVID-19.

163)      If the Defendants truly believed usage of face masks protected people from

COVID-19, then in lieu of barring the Plaintiff from entering their facility because he

was not wearing a face mask, to minimize the spread of COVID-19 in their facility the

Defendants could have suggested rather than required usage of face masks.

164)      The published study *COVID-19 Mortality Risk Correlates Inversely with Vitamin*

*D3 Status, and a Mortality Rate Close to Zero Could Theoretically Be Achieved at 50*

*ng/mL 25(OH)D3: Results of a Systematic Review and Meta-Analysis* is enclosed as

Exhibit 20.

165)      To dramatically reduce the risk COVID-19 posed, in lieu of discriminating

against the Plaintiff on the basis of his not wearing a face mask, the Defendants could

have advised people of the importance of maintaining adequate vitamin D levels.

166)      To mitigate the spread of SARS-CoV-2 / COVID-19 in their facilities without

violating constitutional or civil rights, the Defendants could have used alternative

measures such as ventilation and/or air treatment technologies.

167)      The Defendants imposed a Policy which had the unnecessary effect of creating a

de facto disability for the Plaintiff and on the basis of disability created by the Policy they

barred the Plaintiff from participating in social and regular life activity.

168)      The Defendants imposed a Policy which had the unnecessary effect of segregating

the Plaintiff out of their facility based on his sincerely held religious convictions that he

had communicated to them.

169)    The Massachusetts Department of Elementary and Secondary Education's history
and social science learning standards for 5th grade include, among others, to "Read the
Bill of Rights and explain the freedoms it guarantees; research the historical background
of one of the first ten Amendments and make an argument using evidence for its
inclusion in the Bill of Rights in 1791". These learning standards are enclosed as Exhibit
21.

170)    The Massachusetts Department of Elementary and Secondary Education's history
and social science learning standards for 8th grade include, among others, to "Explain the
historical context and significance of laws enacted by Congress that have expanded the
civil rights and equal protection for race, gender, disability (e.g., the 1964 Civil Rights
Act, 1965 Voting Rights Act, 1990 Americans with Disabilities Act, 1990 Individuals
with Disabilities Education Act), and explain how the evolving understanding of human
rights has affected the movement for civil rights for all" and "Research, analyze, and
report orally or in writing on one area (a, b, or c, below) in which Supreme Court
decisions have made significant changes over time in citizens' lives.  a. Interpretations of
freedoms of religion, assembly, press, petition, and speech under the First Amendment;
for example". These learning standards are enclosed as Exhibit 22.

171)    At the time of their conduct challenged herein, the Defendants were a public
school or held positions in a public school regulated by the Massachusetts Department of
Elementary and Secondary Education.

172)    In January 2022, the Defendants solicited an offer to settle this lawsuit from the
Plaintiff.

173)    The Plaintiff provided a written settlement offer.

174)      The Defendants rejected the Plaintiff's settlement offer in February 2022.

175)      The Defendants have not made a settlement offer to the Plaintiff.

COUNT I

(VIOLATION OF THE AMERICANS WITH DISABILITIES ACT)

(42 U.S.C. § 12101 et. seq.)

176)      The Plaintiff hereby incorporates by reference the above paragraphs, as if fully restated herein.

177)      The Plaintiff brings this claim solely against the Defendant Acton Boxborough Regional School District.

178)      The Plaintiff has a disability as defined under the Americans with Disabilities Act, in that his physician has specifically advised against the wearing of face masks in consultation with, and in review of, the Plaintiff's medical status.

179)      Under the Americans with Disabilities Act, the Defendant was required to provide a reasonable accommodation / modification of its policy to the Plaintiff.

180)      The Defendant offered no reasonable accommodation / modification of its policy, proposing only random solutions of unapproved medical devices not approved for the use suggested.

181)      At no time did any individual with any competence or understanding of the medical issues make any effort to understand the medical issue or to make an offer of reasonable accommodation / modification of its policy with participation by the Plaintiff.

182)      The reasonable accommodation in this case was not to bar the Plaintiff from the life activity, but to exempt the Plaintiff from compliance with the Defendants' Policy, which, in any event, had no nexus to any sound public health objective.

183)     As a result of this failure by the Defendant, the Plaintiff was denied his right of access.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1983

184)     The Plaintiff hereby incorporates by reference the above paragraphs, as if fully restated herein.

185)     The Defendants, acting under the color of a statute, ordinance, regulation, custom, and/or usage, subjected the Plaintiff to the deprivation of rights, privileges, and/or immunities secured by the Constitution and laws.

186)     As a result of this conduct, the Plaintiff has been harmed.

## COUNT III
### VIOLATION OF 42 U.S.C. § 1985

187)     The Plaintiff hereby incorporates by reference the above paragraphs, as if fully restated herein.

188)     This claim is brought specifically against Defendants Peter Light and Erin O'Brien Bettez for their having conspired to deprive the Plaintiff of the equal protection of the laws, or of equal privileges and immunities under the laws, or of having and exercising any right or privilege of a citizen of the United States.

189)     As a result of this conduct, the Plaintiff has been harmed.

## COUNT IV
### VIOLATION OF 1ST AMENDMENT'S FREE EXERCISE OF RELIGION CLAUSE

190)     The Plaintiff hereby incorporates by reference the above paragraphs, as if fully restated herein.

191)     The Constitution and its Bill of Rights have been routinely taught in this country's schools.

192)     A person must pass a civics test to become a naturalized citizen of the U.S.A.

193)     As detailed in above paragraphs and attendant exhibits, The Plaintiff notified the Defendants that being required to wear a face mask violated his sincerely held religious convictions.

194)     The Defendants failed to address the Plaintiff's religious assertion.

195)     The Defendants failed to provide any accommodation of the Plaintiff's sincerely held religious convictions/practices.

196)     The Plaintiff was harmed by the Defendants' violation of his right to free exercise of religion.

<u>COUNT V</u>
VIOLATION OF 1ST AMENDMENT'S FREE PEACABLE ASSEMBLY CLAUSE

197)     The Plaintiff hereby incorporates by reference the above paragraphs, as if fully restated herein.

198)     The Plaintiff was harmed by the Defendants' violation of his right to peaceably assemble.

<u>COUNT VI</u>
VIOLATION OF EQUAL PROTECTION CLAUSE OF 14TH CONSTITUTIONAL
AMENDMENT

199)     The Plaintiff hereby incorporates by reference the above paragraphs, as if fully restated herein.

WHEREFORE, the Plaintiff does pray and request as follows:

1) That the Court, after trial, determine that the Defendant Acton Boxborough Regional School District violated the Plaintiff's rights under the Americans with Disabilities Act, and

2) That the Court determine the Defendants violated the Plaintiff's rights under the Equal Protection Clause of the 14th amendment, his right to free exercise of religion, and his right to peaceably assemble, and

3) That the Court determine that the Defendants, acting under the color of a statute, ordinance, regulation, custom, and/or usage, subjected the Plaintiff to the deprivation of rights, privileges, and/or immunities secured by the Constitution and laws, and

4) That the Court determine that the Defendants Erin O'Brien Bettez and Peter Light conspired to deprive the Plaintiff of the equal protection of the laws, or of equal privileges and immunities under the laws, or of having and exercising any right or privilege of a citizen of the United States, and

5) That the Court declare the District's Policy unlawful as being created outside the Defendants' lawful power, that the policy served no compelling government interest, that the policy was not narrowly tailored to achieve the interest, and that the policy should be deemed without force and effect, and

6) Order the Defendants to refrain from religious and medical discrimination, and

7) That even if the Court were to find the Policy to be lawful, determine that the Defendants failed to exempt and/or accommodate the Plaintiff as required by law, and

8) That this Court award the Plaintiff damages in the amount of $1,500,000, costs and attorney's fees in an amount to be determined, and any other relief deemed appropriate by this Court.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

**Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

| | |
|---|---|
| Date of signing | September 15, 2022 |
| Plaintiff's signature | *Michael Bush* Pro Se |
| Plaintiff's printed name | Michael Bush |
| Address: | 280 Lowell Street, Carlisle MA 01741 |
| E-mail: | bmoc54@verizon.net |
| Phone: | 978-734-3323 |

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Bush, hereby certify that I have, on the 15th day of September, 2022, electronically served a copy of the foregoing and any accompanying document(s) pursuant to Fed. Rule Civ. Proc. 5(b)(2)(E) and Local Rule 5.2 upon the following:

John J. Davis, BBO #115890

10 Post Office Square, Suite 1100N

Boston, MA 02109

*Michael Bush* Pro se

Michael Bush
280 Lowell Street
Carlisle MA 01741
Phone: 978-734-3323
Email: bmoc54@verizon.net